## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **SUZANNE WENDELKEN,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 2:24-cv-** |
| | ) | |
| **MAINE HEALTH,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Suzanne Wendelken, by and through the undersigned counsel, hereby complains against Defendant Maine Health, as follows:

## INTRODUCTION

1.      This case arises under the Americans with Disabilities Act ("ADA") and the Maine Human Rights Act ("MHRA").

2.      This case challenges Defendant's unlawful discrimination and retaliation against Plaintiff because of her disability and request for accommodation.

## THE PARTIES

3.      Plaintiff Suzanne Wendelken ("Wendelken") is an individual residing in the City of Portland, County of Cumberland, and State of Maine.  At all times relevant, Wendelken was a Maine resident, and working at MaineHealth's hospital, Maine Medical Center ("MMC") working toward completion of her residency.

4.     Wendelken graduated from University of Utah with a medical degree and PHD on May 26, 2019. She is a female and identifies as a woman with pronouns she/her/hers. At the time of her termination from MaineHealth she was a 43 year old resident.

5.     Defendant MaineHealth ("MaineHealth") is a Maine non-profit corporation and the largest healthcare organization in the State of Maine with a principle place of business in Portland, Maine. MaineHealth is the parent company of multiple integrated healthcare provider entities all operated under the "MaineHealth" umbrella.

6.     Maine Medical Center ("MMC") is a subsidiary of MaineHealth duly authorized to do business in the State of Maine, operating a medical hospital in Portland, Maine.

7.     MaineHealth has more than 500 employees.

## JURISDICTION AND VENUE

8.     Prior to filing this Complaint, Wendelken filed a charge of discrimination with the Maine Human Rights Commission ("MHRC") and the EEOC. Plaintiff received the right to sue from the MHRC on August 12, 2024, and from the EEOC on October 2, 2024.

9.     The Court has federal question subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331.

## BACKGROUND FACTS

10.     In March of 2019 Wendelken matched into MMC's Anesthesia Residency Program. In conjunction with applying to the residency program, Wendelken submitted her MCAT, ACGME Step exam scores which included a notification that she took the exam with accommodations.

2

11.     Wendelken has a visual disability which she was initially diagnosed with in 1980, at the age of 1-year. She is also diagnosed with ADHD, often associated with the visual disability, which she was diagnosed with as a teenager in the 1990s. Additionally, she was born with a condition called epidermal nervous syndrome.  This syndrome is associated with neural and cutaneous conditions including the visual disability, ADHD, and reduced tactile sensation of her dominant right hand.

12.     The visual disability diagnoses are oculocutaneous albinism, complete foveal hypoplasia, myopia, astigmatism, nystagmus, amblyopia, congenital cataract, and diplopia is relatively mild in the spectrum of the disorder. Wendelken has permanently reduced visual acuity after best optical corrective measures. Functionally her vision is typically 20/40-20/50, but she is occasionally able to vaguely resolve some letters from the 20/30 line with enough time, squinting, and context cues.  Compared to a person with normal vision, Wendelken needs to be twice as close to resolve images and fonts. She is unable to fuse images from her right and left eyes, creating essentially monocular vision which inhibits depth perception. Wendelken can and does drive (maintaining an excellent driving record), and has achieved high levels of education including obtaining a degree in medicine (MD) and a Doctorate in biomedical engineering (Ph.D.).

13.     Wendelken received accommodations for her visual disability during high school, college, graduate, and medical school, including accommodations for standardized testing (SAT,  ACT, MCAT, and USMLE medical board exams). She successfully worked as an engineer in the industry with and without appropriate accommodations.

14.     Wendelken successfully and safely performed procedures as an anesthesiologist in the residency program at MMC right up until the day she was notified she was being constructively discharged on January 27, 2022.

15.     In July of 2019, Wendelken began MMC's Anesthesiology Categorical Residency Program that includes one year of internal medicine internship and 3 years of Anesthesia training, totaling 4 years. Anesthesia board certification requires successful completion of an ACGME certified residency, in addition to the board examinations.

16.     Wendelken was the oldest resident in the Anesthesiology Categorical Residency Program ("ACRP") at MMC.

17.     In the early part of the first year of residency (approximately August 2019), Wendelken informed Human Resources ("HR") of her visual disability through the 'Ask HR' Intranet portal and complained that she was not able to appropriately increase the font size of the electronic medical record software (Epic). Acknowledging that this is a problem, Wendelken connected with an Epic software support team. Although no ideal accommodations were available, together they figured out some workarounds to address the font size issue. The main workaround of using the Windows system settings to globally increase font size was used for several months. However, this functionality was subsequently disabled by the IT department when the system settings were locked down on all hospital PC's for individual users.

18.     On December 29, 2019, Wendelken had a severe injury to her leg while volunteering as ski patrol at a local mountain. At the time she was on a medical ICU rotation. The injury occurred on a Sunday evening. Wendelken attempted to call out sick the following day so that she could be treated. She was instructed to come in because two other residents had also called out sick, but told was told would be released early.

19.     Wendelken was allowed to leave at 3pm and went to urgent care. It was clear from the X-Ray that she sustained at least one fracture and a ruptured ACL. She was given a knee immobilizer, crutches, and a surgical referral.

20.    Wendelken continued to work without absences, occasionally showing up a few minutes late due to her mobility difficulties.  Later an MRI revealed torn ACL, MCL, and LCL, damaged meniscus, and two additional compression fractures to her femur and tibia. She attempt to "pre-hab" prior to a planned surgery in late February 2020.  However, she was not able to "pre-hab" sufficiently and the surgeons were unable to perform the surgery due to excessive inflammation and swelling. Surgery was going to be postponed a month or more. Then the Covid shutdown happened, delaying her knee reconstruction until May 2020. Wendelken continued with physical therapy to rebuild strength in her knee.

21.    On May 27, 2020, following surgery, Wendelken's provider gave her work restrictions limiting her to light duty work, walking and standing limited to 10 minutes at a time with crutches and a knee immobilizer and breaks of 5-10 minutes every hour to elevate and ice. She was also restricted to working a maximum of 10 hours per day and 50 hours per week with physical therapy sessions 1-2 times per week for 30-60 minutes per session. Wendelken could not rush to another location of the hospital because of her mobility restrictions and could not lift, push, or reposition patients. She was also not able to kneel, squat, or crouch.

22.    The work hours Wendelken logged between 6/1/2020-9/4/2020 greatly exceed the maximum allowed by her approved accommodations.

23.    In the summer of 2020, Wendelken informed her Program Director (Director) of her disability (which she also disclosed in the pre-employment medical exam in summer 2019). He provided no accommodations and referred her to an ophthalmologist acquaintance, where she was evaluated by two specialists at the Maine Eye Center in October 2020.

24.     In the Fall of 2020, Wendelken saw two visual specialists who confirmed there are still no "cures" for her visual impairment. She relayed this information back to the program director along with a request for help getting anesthesia-specific accommodations.

25.     In retaliation for the requesting accommodations, MMC acts of direct disability discrimination and harassment intensified, resulting in being unfairly scrutinized in all aspects of her training

26.     During the same time frame, Wendelken's residency Director became more and more critical, her evaluations began to be more negative, even as the Program denied Wendelken the accommodations which would have remedied much, if not all, of the Program's criticisms.  It is important to note that during this same period, Wendelken received many positive comments from attending physicians she worked with, praising her skills, and her improvement in multiple areas, as she struggled to self-accommodate.

27.     In January of 2021, received notice that she would receive an "unsatisfactory" rating for the first 6 months of anesthesia training, which is the first step to academic probation.

28.     In March 2021, Wendelken underwent neuropsychiatric testing for learning disabilities as recommended by her program director, verifying a learning disability and recommending accommodations which were requested but ignored by the program director Dr. Flowerdew, and her assigned advisor Dr. Quaye.

29.     On March 11, 2021, Wendelken's contract with MMC was renewed for another year with advancement to PGY3 (post graduate year 3 status) for the time period of 7/1/2021-6/30/22.  This PGY3 status was not honored by the department and she was denied promotion, prevented from taking the first portion of the anesthesia boards (the BASIC exam), taking senior call duty (a much more desirable call shift) and being allowed

6

opportunities to prove competence (apart from the large number of procedures and cases she performed).

30.    As time passed, Wendelken's repeated requests for accommodations began a cascade of negativity towards her for supposed "professionalism issues" e.g., using Zoom to attend grand rounds or other lectures (rather than being physically in the same room with colleagues who are attending virtually by Zoom), making a single utterance of exasperation in front of but not directed toward a patient ("Oh, come on!" was the comment), and refusing to perform an operative procedure when she felt too physically exhausted and unsafe to perform the procedure during a 24-hour shift.

31.    In the spring of 2021, Wendelken's program Director solicited criticism from colleagues yet did not  provide that feedback to Wendelken until months later, well after the time she could utilize or address the allegations.

32.    In May 2021, after hearing of such derogatory feedback, (Wendelken was not permitted to read it at that time), she pleaded with her advisor and program director to carefully re-consider her performance and abilities given that she had no effective accommodations to date.

33.    In an email to her advisor, Dr. Quaye, who is also a member of the clinical competency committee (CCC), on May 25, 2021, Wendelken wrote, "I have further quantified my visual and reading challenges through testing, and I wanted to remind the committee that I do have a  visual disability in which my vision is not able to be completely corrected, and it takes extra time for me to read and focus on new or complex images. It would be illegal for my slight relative slowness in tasks involving reading or precision vision to be used as a professional metric for advancement. I have been successfully self-accommodating for my disability my entire life and have had to come up with all new accommodation strategies for

anesthesia, which was essentially new to me as of June last year, which may explain some of my initial slowness."

34.     In the same email, Wendelken also demonstrates professionalism with a disability by relating the following, " - Jim Abbott. Most people probably haven't heard of him, but he was a major league pitcher for the Yankees and several other teams. What was remarkable about him was that he was born without a right hand. As a child he loved baseball, and despite being told he couldn't play, he played anyway. Through hard work and with supportive teammates and coaches, he was able to figure out strategies for pitching, throwing, fielding, and even batting, with one arm. I think of him often when I need inspiration. If a one-handed man can figure out how to pitch a no-hitter for the Yankees, I can figure out how to do this well, despite my learning differences, despite my visual challenges. I hope that I will continue to improve and look forward to developing strategies that will not only help me succeed but possibly contribute something novel to the field one day. I will need supportive mentors to help me come up with such strategies. I have been told, in front of superiors, that I am not a "good fit" for anesthesia for reasons that are not particularly quantifiable. That I lack the ability to "multi-task" and that I have poor situational awareness. I hope I can prove the naysayers wrong with my continued efforts, and that one day they will regret saying such a thing. With supportive mentoring, I can succeed because of you, because of the program, and not despite it."

35.     The email demonstrates, again, how she had notified her program of visual and learning disabilities, and that she requested help and initiation of an "interactive process" which went ignored multiple times through multiple channels.

36.     Additionally, Wendelken's requests to reconsider negative evaluations related to her disabilities, including those relating to speed, efficiency, timeliness, and hand-eye

coordination, were ignored, and such negative evaluations were propagated, even amplified, and then used as a basis to place Wendelken on probation.

37.     In a phone call with Dr. Quaye in October of 2021, when Wendelken repeated her request for accommodations and concern about discriminatory professional reviews being used to justify academic probation status, Dr. Quaye stated, "This is the first time I've heard of it" [referring to my disability and requests for accommodation].

38.     On July 15, 2021, Wendelken was going to be placed on academic probation as a direct result of the  Program's refusal to provide the accommodations she requested and continued harassment. Wendelken appealed the decision in September 2021 but was ultimately unsuccessful as the Program upheld the probation status.

39.     On July 24, 2021, Wendelken shared her concerns about a toxic and harassing learning environment to MMC residency director, Dr. Varaklis by email. Wendelken wrote, "I am concerned, however, that I am being unfairly targeted and singled out publicly by my program director. On top of that, I have not been provided with any solid goals to achieve in order to advance to the next level." During a meeting the following week with Dr. Varaklis, the director conveys to her that the evaluations, which she had reviewed, were fair and appropriate and that she felt that program director Dr. Flowerdew was acting appropriately.

40.     A meeting was held with the program director, Dr. Flowerdew, and department head, Dr. Warters on July 29, 2021, to notify Wendelken she was placed on probationary status and the consequences. Of note, Wendelken was denied the opportunity of having a support person such as her academic advisor present. Wendelken was told to "cease and desist" challenging her academic status. Department head, Dr. Warters also referred to Wendelken's written appeal and request for reconsideration as a "17-page Manifesto".

41.    In a meeting in August 2021, Wendelken was informed by Ms. Davis that she was required to return to her specialist to begin the process of requesting specific accommodations—a process that was understood to take time, as specialists were booking appointments months in advance.

42.    Wendelken continued to request accommodations with little to no response through multiple channels.

43.    On September 16, 2021, Eric Brown MD emailed Wendelken conveying "since it's  already a struggle for you with your vision you should really consider a different field because I can tell this one is just too hard for you and too hard on you".

44.    On September 29, 2021, Wendelken attempted to appeal her probation status in front of a committee selected and presided over by Dr. Varakalis.  In her deposition, she again disclosed her disability and how that may have negatively affected her performance without appropriate and reasonable accommodation.

45.    In October of 2021, Wendelken was able to self-accommodate with equipment otherwise  already available in the operating room. Once discovered, Maine Medical Center disabled those functions or forbade Wendelken from using them. One of these self-accommodation methods was simply using the existing scanner attached to the computer she was using in the operating rooms to scan medications directly into the patient charts. This function was disabled, and no work-around or alternative was provided.

46.    Wendelken wrote in an email exchange to the patient care system specialist on October 7, 2021, "This method is helpful for me because I have a visual disability and it takes me much more time to scan through the list of medications each time." The response from patient care systems was, "I apologize that I'm going to find a way to disable this," and from an anesthesia attending, "even though it may seem like it does something, it's not the built

workflow. I will ask you to refrain from doing that until further notice because it's not something we can simply turn on due to a lot of behind-the-scenes data transmission. It may be something we do in the future, but like Mike says, it will take a fair amount of analysis."

47.    On October 19, 2021, Wendelken texted an attending faculty, "...Also if you have time at some point to start the conversation about tech options in context of a visual disability I'd appreciate meeting with you or just talking on the phone if that's easier".  There was no response to this text.

48.    On October 19, 2021, Wendelken received an email from Diane Davis, "ADA Specialist" informing her that the interactive process has ended. Ms. Davis also noted "Please understand that based on these circumstances, you will be expected to complete all essential functions of your role as Resident without accommodation. Any failure to meet performance expectations of your position will result in appropriate performance management…"

49.    On November 17, 2021, Wendelken received communication from MMC's "ADA  specialist" recommending she "go through the accommodation process" and provide "supportive documentation" for the accommodations she requested. This five-page document was clearly not authored by the ADA Specialist. The document requested an excessive amount of detailed information that no "board-certified ophthalmologist" could possibly provide.  This document is intimidating to the point NO ophthalmologist would or could agree to its terms. Certainly, it intimidates a diagnosing ophthalmologist from even participating in the process.

50.    Wendelken was required to obtain three different medical evaluations regarding her disabilities, as well as providing support of her visual impairment from her pediatric ophthalmologist beginning, even after the disabilities had been disclosed and verified during the employee medical screening, and as indicated by the asterisk "Non-

standard testing" designation on standardized testing transcripts provided to the Program during the application process (such designation implies academic accommodations).

51.    On November 24, 2021, in lieu of attending an eye specialist appointment initially scheduled in November 2021, Wendelken provided Ms. Davis a letter of support from her pediatric ophthalmologist and a personal copy of a neuropsychiatric report, supporting the visual disability and ADHD respectively. Of note, Wendelken was unable to see the eye specialist as planned in November because she was required to attend a training simulation.

52.    On December 14, 2021, a neuropsychiatric report supporting ADHD and specific accommodation requests was sent to Ms. Davis from a medical provider.

53.    On December 27, 2021, Wendelken was finally able to attend an appointment with her visual specialist for a second time to ask for a letter of support for specific accommodations.

54.    On January 3, 2022, Ms. Davis received the documentation from Wendelken's visual specialist, again supporting her visual disability and specific accommodations.

55.    While working at MMC a female attending told Wendelken she felt she was treated poorly and differently because she was female.

56.    Wendelken also believes she was treated poorly because of her gender especially with respect to Dr. Warters.

57.    On January 27, 2022, Wendelken was informed that she would be terminated if she did not voluntarily resign.

58.    A "termination" would be placed in her records, as well as be reported to relevant licensing boards, in most cases "termination" is fatal for medical residents hoping to move forward in their training and transferring to another program. Therefore, Wendelken was forced to resign the next day on January 28, 2022.

59.    On February 7, 2022, Wendelken's accommodation requests were finally elevated to program director level, about 8 days after she was forced to resign and well over a year after she initially informed the Program of my visual disability and need for accommodations.

60.    MaineHealth provided Wendelken a separation agreement shortly thereafter on February 11, 2022, providing her with a salary and benefits until the end of her contract, June 30, 2022, and allowing her to continue work on an innovative medical device she was developing related to anesthesiology.

61.    In exchange for being allowed to continue working, she was asked to forfeit the right to pursue litigation or file complaints relating to ADA-protected rights, or any other federally protected rights. In addition, MaineHealth would "own" the rights to the medical device she was developing. Wendelken did not agree to this, resulting in the end of benefits on or around March 31, 2022.

62.    On May 9, 2022, Wendelken's application for unemployment benefits was approved. Although she did "resign", the MDOL determined it for a good cause attributable to that employment and compliant with Maine law (26 M.R.S section 1193(1) and (A)(1) ). Maine DOL Deputy Decision number 1834997 states: "The claimant was employed from 07/01/2019 to 03/31/2022. The claimant reports that she was requesting accommodations for disability to be able to perform her work and her employer was unable to make the accommodations. The employer reports that the claimant did ask for accommodations, and they were unable to provide them. The claimant's leaving was caused by illness or disability, and the claimant took all necessary precautions to protect the employment by having promptly notified the employer of the need for time off, change or reduction in hours or a shift

change and being advised by the employer that the time off or change or reduction in hours or shift change could not or would not be accommodated."

63.     MaineHealth continued to harass Wendelken long after her employment ended and attempted to deprive Wendelken of approved unemployment benefits, thus again, interfering with her rights. On May 24, 2022, in a document submitted to Maine Department of Labor challenging the award of unemployment benefits, they engaged in blatant character defamation in an attempt to discredit her. In this letter, MaineHealth  states: there were professional issues at the time of separation "in connection with her lack of honesty, integrity, reliability, and responsibility". However, performance evaluations will demonstrate only professional issues relating to procedural efficiency and time management.

64.     The issues Wendelken is aware of were related to her disability and would likely have been alleviated with appropriate and reasonable accommodations.

65.     The accommodations Wendelken requested were:

· Access to software and/or computer system settings that will allow the enlargement of fonts on EPIC to at least 12 pt

· Access to and/or permission to use personal handheld devices to enlarge images

· Access to and/or permission to use personal hand-held ultrasound for line placement

· Access to a large monitor (>22") on a telescoping mount in the resident library

· Access to and/or permission to use personal laptop with pinch-zoom or scroll-zoom capability in the ORs

· Access to and/or permission to use personal vein finder for IV placement

• Access to and/or permission to use personal video laryngoscope such as a McGrath in all cases requiring intubation

• Permission to remove privacy screen covers which obscure vision on monitors during use.

• 1.5 time allowed for all assignments, tests, quizzes, administrative assignments, or any assignment involving

significant reading

• Shift limits of 12 hours without at least an 8 hour break prior to shifts

• 1 hour of protected time daily for administrative work (emails, evaluations, etc).

66.    Based on the severity and duration of her broken leg and torn ligaments, and its impact on daily activities like walking and working, the injury amounted to a disability under the ADA and the Maine Human Rights Act ("MHRA").

67.    Wendelken's visual impairment and learning disabilities amount to a disability under the ADA and MHRA.

68.    Throughout the time that Wendelken suffered from this disability, MaineHealth treated her in a discriminatory and retaliatory manner, often stating Wendelken was "too slow" and using it as a basis for poor performance.

69.    MaineHealth regarded Wendelken as disabled in violation of the ADA and MHRA.

70.    MaineHealth retaliated against Wendelken for needing to take time off for treatment and physical therapy appointments when she was suffering from this disability.

71.    MaineHealth failed to accommodate Wendelken by requiring she exceed hours worked, refusing to allow her to elevate her leg in the office or take time off for the injury.

72.     MaineHealth failed to accommodate Wendelken by providing reasonable accommodations for her disability requested in paragraph 51.

73.     MaineHealth took adverse action against Wendelken in violation of the ADA and MHRA by stating they would terminate her employment if she did not resign as a result of her disability and request for accommodations on January 27, 2021.

74.     At the time MaineHealth fired Wendelken, she was still attending appointments for her disability and reengaged in the interactive process.

75.     MaineHealth has continued to retaliate against Wendelken in violation of the ADA and MRHA since her termination by making knowingly untruthful statements to the MDOL, in an attempt to prevent her from receiving unemployment benefits.

76.     Wendelken believes that MaineHealth treated her differently because of her disability coupled with her age and gender.

77.     Wendelken believes the repeated comments that she was "too slow" was caused by her disability and lack of accommodations as well as in reference to her age as she was the oldest resident, in violation of the ADA, ADEA, and MHRA.

78.     Wendelken believes she was discriminated against because of her disability, age, and gender in violation of Title VII, the ADA, ADEA, and the MHRA.


## COUNT I – DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA
### (29 U.S.C. § 621 *et seq.*)

79. Plaintiff repeats the allegations contained in Paragraphs 1 through 79 as if fully stated herein.

80. Wendelken was a qualified individual with a disability within the meaning of the ADA.

81. Defendant regarded Wendelken as having a disability that substantially impaired her ability to see, focus, and walk.

82. Defendant discriminated against Wendelken and treated her differently because of the perceived and actual disability resulting in her probationary status and forced resignation.

83. In addition, Defendant retaliated against Wendelken for requesting an accommodation for her disability.

84. As a result of Defendant's disability discrimination and willful violation of the ADA, Wendelken has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

85. Defendant recklessly, knowingly, and/or willfully retaliated against Wendelken in violation of the ADA and therefore Plaintiff is entitled to liquidated and punitive damages.

WHEREFORE, Plaintiff Suzanne Wendelken requests that the Court award her damages for Defendant's violation(s) of the ADA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT II – AGE DISCRIMINATION IN VIOLATION OF THE ADEA
### (29 U.S.C. § 621 *et seq.*)

86. Plaintiff repeats the allegations contained in Paragraphs 1 through 85 as if fully stated herein.

87. Wendelken was a member of a protected class based on her age at the time she was poorly evaluated, put on probationary status, and forced to resign in lieu of termination.

88. The ADEA makes it illegal for an employer to discriminate against an employee because of age.

89. Defendant's actions described above amount to age discrimination in violation of the ADEA, because MaineHealth poorly evaluated Wendelken, put Wendelken on probationary status, and forced Wendelken to resign in lieu of termination because of his age.

90. The reasons given for her probationary status and forced resignation are a pretext.

91. As a result of Defendant's age discrimination and willful violation of the ADEA, Wendelken has suffered and is entitled to damages, including but not limited to: lost wages and benefits, front pay, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff Suzanne Wendelken requests that the Court award her damages for Defendant's violation(s) of the ADEA, in the form of lost back pay, front pay, compensatory damages, liquidated damages, punitive damages, attorney's fees, costs and expenses, equitable and injunctive relief, and all other relief afforded to her by law.

## COUNT III – SEX-BASED DISCRIMINATION IN VIOLATION OF TITLE VII
### (42 U.S.C. § 2000e *et seq*.)

92. Plaintiff repeats the allegations contained in Paragraphs 1 through 91 of her Complaint as if fully set forth herein.

93. Wendelken is female and a member of a protected class.

94. For all the reasons set forth above, MaineHealth has engaged in discrimination against Plaintiff on the basis of sex.

95. As a result of MaineHealth's sex-based discrimination, Plaintiff has suffered compensatory damages and economic loss.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT IV – DISCRIMINATION IN VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5 M.R.S. § 4571 *et seq.*)

96. Plaintiff repeats the allegations contained in Paragraphs 1 through 95 of her Complaint as if fully set forth herein.

97. For all of the reasons set forth in Counts I through III above (Disability discrimination, Age Discrimination, Sex Discrimination), unlawful discrimination against Plaintiff have taken place in violation of the Maine Human Rights Act.

98. As a result of MaineHealth's discriminatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## COUNT V – RETALIATION IN VIOLATION OF THE MAINE HUMAN RIGHTS ACT
### (5 M.R.S. § 4571 *et seq.*)

99. Plaintiff repeats the allegations contained in Paragraphs 1 through 98 of her Complaint as if fully set forth herein.

100.    For all of the reasons set forth in Counts I through IV above, unlawful retaliation against Plaintiff has taken place for opposing practices made illegal by the Maine Human Rights Act in violation of the Maine Human Rights Act.

101.    Defendant retaliated against Plaintiff for requesting accommodations and for complaining to Defendant that they repeatedly failed to provide her accommodation. Further Defendant retaliated against Plaintiff for appealing the discriminatory probationary status.

102.    As a result of MaineHealth's discriminatory and retaliatory actions, Plaintiff has suffered and is entitled to damages, including but not limited to: lost wages and benefits, compensatory damages including emotional pain and suffering and lost enjoyment of life, attorney's fees, costs and expenses.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award her compensatory damages, lost wages, liquidated damages, punitive damages, reasonable costs and attorney's fees, pre- and post-judgment interest, and such further relief the Court may deem proper.

## JURY TRIAL DEMAND

Plaintiff Suzanne Wendelken hereby demands a jury trial on all matters so triable under the laws and Constitution of the United States and the State of Maine.

Respectfully submitted,

Dated: October 29, 2024                    */s/ Danielle Quinlan*

_____
Danielle Quinlan, Bar No. 5480
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*dquinlan@whiteandquinlan.com*

*/s/ Laura H. White*

_____
Laura H. White, Bar No. 4025
*Attorney for Plaintiff*
WHITE & QUINLAN, LLC
62 Portland Rd., Suite 21
Kennebunk, ME 04043
(207) 502-7484
*lwhite@whiteandquinlan.com*